### A98A0059. PITTMAN v. THE STATE.
(498 SE2d 309)

ELDRIDGE, Judge.

The defendant, Paul E. Pittman, appeals his conviction for the offenses of burglary and aggravated assault.[1] The defendant's sole enumeration of error is that the trial court erred in failing to grant him a directed verdict on the charge of burglary.

"A directed verdict of acquittal is proper only where there is no

---

[1] The defendant was also indicted for the offense of aggravated stalking. However, the jury returned a verdict of not guilty on this count of the indictment.

conflict in the evidence and the evidence introduced with all reasonable deductions and inferences therefrom shall demand a verdict of acquittal. OCGA § 17-9-1 (a). On appeal we must view the evidence in the light most favorable to the verdict, [the defendant] no longer enjoys the presumption of innocence, and we do not weigh the evidence nor judge the credibility of the witnesses. Further, we do not speculate which evidence the jury chose to believe or disbelieve." (Citations and punctuation omitted.) *Thompson v. State*, 210 Ga. App. 655, 656 (1) (436 SE2d 799) (1993).

In this case, the evidence shows that the defendant and the victim were married in 1987 and divorced in 1988. Subsequent to the divorce, the defendant resided in the victim's house continuously, except for a brief period when the defendant "moved out because he met a girl." However, after the divorce, the defendant and the victim lived separately within the house; they had "separate bedrooms, separate paychecks, [and] separate food." The victim testified that she paid for all the maintenance on the house, but allowed the defendant to live in her house after the divorce because "he wouldn't let [her] go"; he would "hold things over [her]" and threaten her.

On June 30, 1996, the defendant moved out of the victim's house and moved to the Burnett Ferry Mobile Home Park. When the defendant moved, he took all of his personal belongings, except for some clothing which he refused to take. The defendant no longer had a key to the victim's house. The victim testified the defendant did not have an open invitation to visit her house and that she did not initiate any contact with him; the only contact the victim had with the defendant was when he would call her. The victim went on to testify that she had not given anyone permission to be at her house on September 16, 1996.

On the morning of September 16, 1996, the day before the victim and the defendant were due to be in court for a hearing, the victim went to the doctor. When the victim left her house, all the windows and doors were secured. When the victim returned to her house, she entered though the back door near the kitchen. As she entered, she saw the defendant crouched in the kitchen with a hammer in his hand. The defendant attacked the victim with the hammer.

The victim testified that the defendant hit her on her legs with the hammer, and when she attempted to block the blows of the hammer, the defendant hit her hands with the hammer. The victim was able to grab the hammer by the head and jerk it out of the defendant's hand; she threw the hammer toward the porch, because the porch door was glass and she hoped the door would break and draw attention to her plight. The hammer hit the door, but bounced off the door without breaking the glass. The defendant tried to pick up the hammer, but the victim was able to reach it first and throw it

outside. The victim went on to testify that she thought she was going to die and started clawing the defendant in the face. The victim fought the defendant as he pushed her down the steps. At the bottom of the steps, the victim fell on some ceramic ducks in the flower bed. The victim further testified that she bit the defendant with such force her partial plate was displaced and it fell out of her mouth. The victim stated that, once the defendant had her on the ground, he "was on [her] back" choking her with one hand so that she could hardly breathe.

When the victim asked the defendant why he was attacking her, he replied "because I love you." In an attempt to placate the defendant, the victim replied "I love you too." Then, the defendant agreed to release the victim if "they could work it out." The victim, in her continuing effort to placate the defendant, agreed to sit outside and talk to him. The defendant told the victim that he was sorry, and the victim promised to help the defendant get some "help" from a doctor. The victim then drove the defendant home.

After leaving the defendant at his trailer, the victim drove to Georgia Tool & Equipment Rental, where her friends worked. James Pruitt testified that, when the victim arrived, she was crying and appeared to be almost in shock; there were bruises on her neck and she was bleeding. Pruitt called the police. Once the police officer arrived, Pruitt, at the suggestion of the police officer, called for an ambulance to transport the victim to the hospital. At the hospital, the victim received stitches in her hand and was released.

Sergeant Perry Maynard of the Floyd County Police Department investigated the crime scene. He testified that, when he arrived at the victim's house, the victim had just returned from the hospital emergency room; she was upset and in "somewhat" of an agitated state; she had abrasions on her hands, arms, and legs; and she had marks and bruises on her neck. Sergeant Maynard went on to testify, that, in addition to finding some overturned potted plants and broken ceramic duck figures outside the back door, he also found the victim's partial denture plate on the ground by the back steps, the window of the front door broken, and the front door partially open.

The defendant did not testify at trial or call any witnesses. Although the defendant was present in court during jury selection, he did not appear for the trial of the case or report his whereabouts to his counsel or the court. The defendant could not be located by his counsel, and the trial proceeded in the defendant's absence. The defendant was rearrested just prior to sentencing.

"A person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within the dwelling house of another." OCGA § 16-7-1 (a). The defendant argues that there was insufficient evidence that he

lacked "authority" to enter the victim's house. Specifically, the defendant alleges that, even though he was domiciled at Burnett Ferry Mobile Home Park, he had left a truck he drove, a boat he operated, clothing, and other personal belongings at the victim's house, and that he intended to maintain a residence there. Therefore, he asserts that he had the "authority" to enter the victim's home.[2] We disagree.

Only authorized entry into a building or mistake of fact would constitute an affirmative defense to a burglary charge. *Gray v. State*, 163 Ga. App. 720 (294 SE2d 697) (1982). Once the victim had withdrawn the defendant's authority to enter her house, the fact that the defendant may have once lived at the victim's house and had left personal property within the house does not, in itself, give the defendant subsequent authority to enter. The Supreme Court held that "[a]n entry into the separate residence of an estranged spouse, without authority and with the intent to commit a felony or theft therein, constitutes burglary." *State v. Kennedy*, 266 Ga. 195, 196 (467 SE2d 493) (1996), overruling *Mitchell v. State*, 263 Ga. 129 (429 SE2d 517) (1993), reversing *Kennedy v. State*, 215 Ga. App. 232 (450 SE2d 252) (1994). Further, in *Hug v. State*, 205 Ga. App. 746 (423 SE2d 700) (1992), this Court found that, when the victim gave the defendant a key to her condominium unit, but later changed the lock and did not give the defendant a new key, the authority to enter her condominium had been withdrawn. Therefore, the defendant's subsequent entry into her home, with a new key which he had made without her permission, supported a burglary conviction.

In this case, the evidence shows that the defendant had moved out of the victim's house approximately two and one-half months earlier, taking the majority of his personal possessions. The defendant no longer had a key to the victim's house. The victim had not given the defendant an open invitation to return to her house at his pleasure and had not given the defendant the authority to enter her home on the day of the burglary. Therefore, a jury could find that the defendant did not have authority to enter the victim's house. Further, the defendant entered the victim's house with force, i.e., by breaking the glass out of her front door, and from such conduct, the jury could infer that the defendant knew that he was without authority to be in the victim's house.[3] Since authority for the defendant to

---

[2] There is no evidence in the record that the defendant's car or boat was at the victim's house on September 16, 1996. The only evidence of the defendant's personal property left at the victim's house after his departure was some clothing, which he had refused to take.

[3] Our holding in *Hutson v. State*, 220 Ga. App. 609 (469 SE2d 825) (1996), is not applicable. In *Hutson*, this Court found that a 15-year-old daughter was a rightful occupant of her parents' home, and her invitation conveyed authority to the defendant to disregard an earlier notice that he was barred from the home.

enter the victim's house had been withdrawn and had never been subsequently re-issued, the evidence in this case is more than sufficient for a rational trier of fact to have found the defendant guilty beyond a reasonable doubt of the offense of burglary under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. Blackburn, J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED FEBRUARY 26, 1998.

*John F. McClellan, Jr.*, for appellant.

*Tambra P. Colston, District Attorney, Lisa W. Tarvin, Assistant District Attorney*, for appellee.